**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROSELLE SUCHARSKI, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| RANJANJUM PATEL, M.D., | : | |
| Defendant. | : | No. 12-3298 |
| | : | |

**<u>MEMORANDUM OPINION</u>**

Defendant Rajanjum Patel, M.D. seeks to preclude Plaintiff Roselle Sucharski's expert witness, Mark Graham, M.D., from testifying that Dr. Patel's actions or omissions "increased the risk of harm" to decedent Zeney Sucharski. <u>See</u> Dr. Patel's Mot. (doc. 92). The issue in this case is whether Dr. Patel's withholding of Coumadin, a prescription decedent was receiving prior to Dr. Patel's care, directly caused or increased the risk of decedent having a stroke. Sucharski argues that she should be allowed to proceed on both direct causation and increased risk of harm theories. Sucharki's Ans., Memo (doc. 96). Alternatively, she argues that she should be allowed to proceed only on an increased risk causation theory. Sucharski Ans. at 3.

I deny Dr. Patel's motion. Under Pennsylvania law, Sucharski cannot proceed on both direct causation and an increased risk of harm theories because they are mutually exclusive. An action that allegedly increased the risk of harm cannot have directly caused the harm. Further, based on the alleged facts and experts' reports, only an increased risk of harm theory applies here, thereby precluding Sucharski from alleging direct causation. Sucharski may proceed, as she has requested, solely on the increased risk of harm theory.

A plaintiff asserting a medical malpractice claim must establish: (1) a duty owed by the physician to the patient; (2) a breach of that duty; (3) that the breach was the proximate cause of,

or a substantial factor in, bringing about the patient's harm; and (4) that the patient suffered damages as a direct result of the harm.[1] Mitzelfelt v. Kamrin, 584 A.2d 888, 891 (Pa. 1990).  A plaintiff also must present an expert to testify to a reasonable degree of medical certainty that the physician deviated from the standard of medical care and that the deviation was the proximate cause of the harm suffered.  Id. at 892.  In some cases, however, direct causation cannot be established because "irrespective of the quality of the medical treatment, a certain percentage of patients will suffer harm."  Id.  In those cases, a plaintiff may introduce evidence that defendant's negligence "increased the risk of harm."  Hamil v. Bashline, 392 A.2d 1280, 1286 (Pa. 1978); see id. (interpreting Restatement (Second) of Torts Section 323, Negligent Performance of Undertaking to Render Services, as a relaxed standard in cases where defendant increased the risk of harm).[2]  To find a defendant's negligence increased the risk of harm, the jury must determine "whether the harm would have resulted from the independent source even if defendant had performed his service in a non-negligent manner."  Id. at 1287; see Vogelsberger v. Magee-Womens Hosp. of UPMC Health Sys., 903 A.2d 540, 563 (Pa. Super. Ct. 2006) ("if the expert can opine to a reasonable degree of certainty that the acts or omissions could have caused the harm, then it becomes a question for the jury with regard to whether they believe it caused the harm") (emphasis in original) (citation omitted).

---

[1]      The parties agree that Pennsylvania law applies in this diversity case.

[2]      The Restatement (Second) of Torts Section 323 states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965).

In <u>Mitzelfelt</u>, the Court explained that an increased risk of harm theory would be appropriate in a case where a doctor failed to timely diagnose breast cancer.  584 A.2d at 892. "Although timely detection of breast cancer may . . . have reduce[d] the likelihood that the patient" would have died, "even with timely detection and optimal treatment, a certain percentage of patients unfortunately will succumb to the disease." <u>Id.</u>  Thus, the Court concluded that if "there is testimony that there was a failure to detect the cancer in a timely fashion, and such failure increased the risk" of an early death or harm to the patient, the jury must consider whether the physician's acts or omissions "were a substantial factor in bringing about the harm." <u>Id.</u>; <u>see also</u> <u>Billman v. Saylor</u>, 761 A.2d 1208, 1212 (Pa. Super. Ct. 2000) (increased risk of harm theory applies "where a patient's blood pressure was permitted to drop to a low level during surgery . . . and cases where a patient's preoperative fall increased the risk of surgery") (citations omitted).

The Pennsylvania Supreme Court has not addressed whether a plaintiff may proceed simultaneously under both a direct causation theory and an increased risk of harm theory.[3]  The Supreme and Superior Courts, however, have explained that increased risk of harm applies when it would be impossible for any physician to opine that defendant's negligence was the direct cause of an injury.  <u>See</u> <u>Mitzelfelt</u>, 584 A.2d at 894; <u>see also</u> <u>Billman</u>, 761 A.2d at 1212-13 (noting cases where plaintiff is unable to show that defendant caused the harm, but that defendant increased the risk of harm); <u>Vogelsberger</u>, 903 A.2d at 563 ("where it is impossible to

---

[3]     A Pennsylvania trial court has noted that "research did not reveal any appellate opinions discussing," whether an increased risk of harm instruction can be given if there is evidence of direct cause of plaintiff's injury.  <u>See</u> <u>Brown v. Sloane</u>, No. 01323, 2011 WL 6296640, at n.3 (C.C.P. Phila. Cnty. Nov. 22, 2011).

state with a reasonable degree of medical certainty that the negligence actually caused the injury," the increased risk of harm standard applies).

I must predict whether the Pennsylvania Supreme Court would find that a plaintiff may assert both causation theories by looking at Pennsylvania court decisions and federal courts interpreting Pennsylvania law, other state court decisions, and any other reliable information and data tending to show how the Pennsylvania Supreme Court would decide the issue.  See Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Amer., 693 F.3d 417, 433 (3d Cir. 2012); Norfolk S. Ry. Co. v. Basell USA, Inc., 512 F.3d 86, 91-92 (3d Cir. 2008).

The Superior Court, in an unpublished, non-precedential, opinion,[4] interpreted a Pennsylvania Supreme Court case as allowing a plaintiff to present evidence of direct causation, without being precluded from also receiving an increased risk of harm jury instruction.  See Weaver v. St. Christopher's Hosp., No. 1759 EDA 1999, at 5-6 (Pa. Super. Ct. Dec. 29, 2000) (attached as Ex. A) (citing Jones v. Montefiore Hosp., 431 A.2d 920, 924 (1981) (jury should have been instructed on increased risk of harm "whether or not the medical testimony as to causation was expressed in terms of certainty or probability.")).  The Superior Court explained in Jones, and the case before it, there was "sufficient evidence . . . presented by both parties to raise the issue of increased risk," to warrant a jury instruction.  Id. at 6.  It reasoned that because both parties' experts conceded that it was uncertain when the injury occurred, the "case presented a situation where it was difficult for the physicians to testify to a reasonable degree of certainty that" defendant's actions caused the injury.  Weaver, No. 1759 EDA 1999, at 8.  Thus, Weaver is

---

[4]     The Superior Court Internal Operating Procedure § 65.37 states:  "An unpublished memorandum decision shall not be relied upon or cited by a Court or a party in any other action or proceeding," except when relevant in particular res judicata or criminal proceedings.  210 Pa. Code § 65.37.

limited to situations where neither expert can testify with certainty as to direct causation. <u>Weaver</u>, No. 1759 EDA 1999, at 6.

This is consistent with the view of Pennsylvania trial courts, which have held that the "increased risk of harm" theory is not applicable when a plaintiff's expert testified that the defendant's negligence was the direct cause of the alleged harm.  See <u>Snyder v. Hawn</u>, No. 2004 CV 635, 2006 Pa. Dist. & Cnty. Dec. LEXIS 256, at *15, 20 (C.C.P. Dauphin Cnty. Sept. 28, 2006) (increased risk of harm inapplicable when "Plaintiff's expert opined unequivocally that the Defendants' alleged negligence caused the harm" and the expert's "testimony dispel[ed] the argument that the evidence warranted the increased risk of harm standard") <u>aff'd</u> 935 A.2d 34 (Pa. Super. Ct. 2007); <u>Brown</u>, 2011 WL 6296640 (increased risk of harm "applies only in cases 'where it is impossible to state with a reasonable degree of medical certainty that the negligence actually caused the injury,'" (quoting <u>Vogelsberger</u>, 903 A.2d at 563), and increased risk of harm instruction "cannot be given where the plaintiff introduces evidence of a direct cause of the plaintiff's injury"); <u>Pentz v. Garvin</u>, No. CI-07-08727, at 19 (C.C.P. Lancaster Cnty., Dec. 22, 2010) (because plaintiffs' causation expert opined that defendant's conduct was the direct cause of the injuries, increased risk jury instruction not warranted) (attached as Ex. B) <u>aff'd</u> 47 A.3d 1232 (Pa. Super. Ct. 2012); <u>Wright v. Conte</u>, No. 2003-0578, at 4-5 (C.C.P. Armstrong Cnty., Dec. 6, 2007) (increased risk of harm instruction not warranted when plaintiff's expert testified that defendant was negligent, and defendant's negligence was the cause of plaintiff's injuries, making the "requisite link" between defendant's negligence and plaintiff's harm) (attached as Ex. C) <u>aff'd</u> 968 A.2d 805 (Pa. Super. Ct. 2009).

The Subcommittee Note in the Pennsylvania Suggested Standard Jury Instructions for Medical Practice further supports the proposition that a plaintiff cannot proceed under both direct

and increased risk of harm.  It states: "[t]he principle of increased risk of harm is applicable where direct evidence of causation is an impossibility."  Subcomm. Note § 14.20 (Civ.), Medical Malpractice—Factual Cause.  It also states that the increased risk of harm instruction is appropriate when no expert can testify that an act or omission directly caused the result, but can testify that such conduct increased the risk of injury.  Id.

Similarly, courts in other jurisdictions have found that the increased risk of harm theory, sometimes referred to as "loss of chance" doctrine, applies only when a plaintiff cannot satisfy the traditional causation standard.  See McMullen v. Ohio State Univ. Hosp., 725 N.E.2d 1117, 1122, 1124 (Ohio 2000) ("loss of chance" doctrine does not apply where the plaintiff proved a direct causal relationship to the decedent's death because the doctrine must be conditioned upon a negative finding of proximate cause) (citation omitted); Dughaish v. Cobb, 729 N.E.2d 159, 166 (Ind. Ct. App. 2000) (plaintiffs not entitled to lessened causation standard because they argued that the defendant's failure set in motion chain of events that caused an injury).

Although some state courts have recognized the possibility that a plaintiff may assert direct and increased risk, those courts made such findings only in dicta or in discussing damages. See e.g. Geesaman v. St. Rita's Med. Ctr., 917 N.E.2d 867, 877 (Ohio Ct. App. 2009) ("we fail to find any legal obstacle in Ohio law for the Geesamans to have pursued both the traditional notion of proximate causation and the relaxed causation standard of loss of less-than-even chance"); Renzi v. Paredes, 890 N.E.2d 806, 809, 813 (Mass. 2008) ("A jury may find the defendant liable either for causing the patient's wrongful death or for causing the patient's loss of a chance to survive, but not for both," and "the judge should make it clear to the jury that only one kind of damages or the other may be awarded.") (emphasis in original).

Based on the foregoing, I predict that the Pennsylvania Supreme Court would not allow a plaintiff to proceed on both a direct and an increased risk of harm theory here.  The non-precedential Weaver opinion applies to the limited situation where the timing of the injury is disputed and both parties' experts concede either a direct causation or an increased risk of harm theory could apply.  Thus, it would be "difficult for the physicians to testify to a reasonable degree of certainty that" defendants caused the harm.  See Weaver, No. 1759 EDA 1999, at 8.

Sucharski's case does not feature such facts.  Here, Dr. Graham appears to have carelessly written his report by referencing both proximate cause and an increased risk of harm.  See Dr. Graham's Rep. (Dr. Patel's Ex. A) at 1-2; Dr. Graham's 5/2/13 Rep. (Dr. Patel's Ex. B) at 3.  I construe his report in the only way that comports with logic, that is, as asserting that Dr. Patel's alleged actions increased decedent's risk of having a stroke by causing him to be insufficiently anticoagulated.  See Dr. Graham's Rep. (Dr. Patel's Ex. A) at 1; Mitzelfelt, 584 A.2d at 894 (court looked to the substance of expert's testimony to determine whether it met the required causation standard); Billman, 761 A.2d at 1214 (court read expert's report in its entirety and in conjunction with expert's previous letter).

Dr. Patel, meanwhile, will offer two experts, Dr. Bruce G. Silver and Dr. Garry D. Ruben.  See Dr. Bruce G. Silver's Rep. (doc. 98); Dr. Garry D. Ruben's Rep. (doc. 99).  Dr. Silver states that decedent "had atrial fibrillation which predisposed him to having strokes," decedent was "susceptible to having strokes whether on Coumadin or not," and "[n]othing that Dr. Patel did or did not do caused Mr. Sucharski to have a stroke."  Dr. Silver's Rep. at 3.  Dr. Ruben found that decedent's stroke, while in Dr. Patel's care, would not have been prevented by Coumadin because his stroke was not caused by clots associated with atrial fibrillation.  Dr. Ruben's Rep. at 3.  He also found that decedent previously had a stroke while he was on

7

Coumadin and concluded that even if decedent had been therapeutic on Coumadin, the stroke still would have occurred.  Id. at 3-4.

 Neither defense expert states that Dr. Patel's actions or omissions increased decedent's risk of a stroke.  Thus, the reasoning of Weaver, which would allow Sucharski to proceed on both causation theories, is not applicable.  Because Sucharski is going to proceed on the increased risk of harm theory, Sucharski is precluded under Pennsylvania law from asserting a direct causation theory.  By definition, increasing a person's risk of harm necessarily means that the conduct did not directly cause the harm.  Rather, it simply increased the chances that that result would have occurred.

 An increased risk theory also is consistent with Sucharski's alleged facts.  She claims decedent had a history of minor strokes, caused by atrial fibrillation, that were treated by Coumadin.  Sucharski's Memo. at 7.  Thus, he was predisposed to strokes.  Decedent was in Dr. Patel's care for a hip fracture and Dr. Patel withheld decedent's Coumadin.  Id.  By doing so, she alleges Dr. Patel was increasing decedent's risk of having a stroke, to which he was already susceptible.[5]  Id.  Dr. Graham may testify at trial only to increased risk of harm posed under those facts.

 An appropriate Order follows.

---

[5] Dr. Patel contends that, regardless whether he properly anti-coagulated decedent at the time of his stroke, decedent's stroke was caused by his arteriosclerotic vascular disease and none of his actions or inactions caused or contributed to decedent's stroke.  See Dr. Patel's Pre-Trial Memo. (doc. 74); see also Hamil, 392 A.2d at 1283 (defendant's expert testified that the patient's death was imminent regardless of any treatment the defendant may be provided); Weaver, No. 1759 EDA 1999, at 7 ("[a]ppellees claimed that the dead bowel had already developed by the time [the patient] had arrived at the hospital . . . thus any alleged delay in surgery was immaterial").